UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SCOTTIE GIBSON and LOREN JUSI,

                    Plaintiffs,                      Case Number 16-11380

v.                                               Honorable David M. Lawson

DEPUTY T. O'DONNELL,

                    Defendant.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Responding to a complaint by a neighbor of an argument in progress, defendant Saint Clair County Sheriff's Deputy Timothy O'Donnell went to plaintiff Scottie Gibson's apartment. When no one answered his loud knocks on the door, despite the obvious presence of occupants, and after waiting about 40 minutes, O'Donnell breached the apartment door, finding Gibson and his girlfriend, plaintiff Loren Jusi, naked in the shower together. Despite both plaintiffs' assurances that no domestic quarrel had occurred, O'Donnell arrested Gibson for domestic assault. Gibson spent just over two days in jail, after which he was released when the state prosecutor declined to charge him with any crime. The plaintiffs sued O'Donnell via 42 U.S.C. § 1983 for violating their Fourth Amendment rights in two respects: breaking into their dwelling without a warrant, and arresting Gibson without probable cause. O'Donnell has filed a motion for summary judgment seeking dismissal of the complaint on the basis of qualified immunity. The plaintiffs also move for partial summary judgment on liability. The parties presented oral argument on May 4, 2017.

O'Donnell's entry into the plaintiffs' apartment without a warrant presents a close question under clearly established Fourth Amendment law, even in light of the plaintiffs' version of the facts.

But the doctrine of qualified immunity protects public officials against liability in close cases. However, viewing the facts in the light most favorable to the plaintiffs, O'Donnell's arrest of Gibson without probable cause violated Gibson's clearly established constitutional rights, which a reasonably competent police officer should have known at the time. The Court will grant in part and deny in part O'Donnell's motion for summary judgment. But the plaintiffs' version of the facts is not the only version; the factual contest, therefore, precludes partial summary judgment for the plaintiffs.

## I.

Although summary judgment presumes the absence of material questions of fact, Fed. R. Civ. P. 56(a), the parties have presented competing versions of the events.

### A. Scottie Gibson

According to Gibson, around 12:30 a.m. on January 15, 2016, he and his live-in girlfriend, Loren Jusi, had an argument. Gibson testified that during the argument, the plaintiffs had "both raised [their] voice[s]," but they were "[n]ot very loud," and "not like yelling at the top of [their] lungs." The argument, although it went on for some time, and included "screaming" and "yelling," did not involve any physical contact. Gibson stated that Jusi never asked him to "stop," and she was not sobbing or crying before the police arrived; she did ask him to "stop" when he went to answer the door when the police knocked, and Gibson saw her crying when he later was handcuffed and arrested. Gibson stated that the argument the couple had was about Jusi's ex-boyfriend sending her text messages and trying to reestablish contact with her. Gibson believed that the downstairs neighbor called the police only because of the noise from the argument, and that he had made a false

report because the neighbor did not want them to live in the building any more, since the apartment above him had been empty before they moved in.

When Deputy O'Donnell arrived, Gibson heard him pounding on the door and calling out his and Ms. Jusi's names, asking them to come open the door. Gibson did not hear anyone say they were from the Sheriff's Department, but he "guessed it was the police" because of the late hour and the way they were banging on the door. When the officers arrived, the plaintiffs were in the hallway of their apartment, which is near the front door, and they were getting ready to get into the shower. The plaintiffs did not answer the door, and the officers continued to pound on it for some time between five and 20 minutes by Gibson's estimation.

Gibson testified that if the officers heard anyone crying or saying "stop," it was Jusi crying because she was afraid that if Gibson answered the door the police falsely would arrest him for domestic violence; she told him "stop" when he was going to answer the door. When the pounding stopped for a time, Gibson and Jusi thought the officers were gone, so they went ahead and got into the shower. When the officers returned and began pounding on the door again, the couple was in the shower and could not clearly hear what was being said. After they thought the police had left and got into the shower, Gibson and Jusi started having sex, and they were still doing that when they heard the front door kicked down. The officers then came to the bathroom door and told the plaintiffs they would kick that door down too if the plaintiffs did not come out. Ms. Jusi yelled from the bathroom that she was in the shower and naked and told the officers not to enter the bathroom. O'Donnell asked who was in the bathroom with her, and Jusi said "my boyfriend." When asked if that was Gibson, she said yes. Jusi then opened the door; both plaintiffs were wrapped in towels.

The police separated them, with Gibson staying just outside the bathroom door, while Jusi was taken to the main room of the apartment.

Gibson testified that, after he came out of the bathroom, he had "about two minutes" of conversation with O'Donnell, then the defendant told him to turn around and that he was "going to jail," and handcuffed him. Meanwhile the other officers "had flashlights" and "were going through all [the] rooms" and "searching everywhere." Gibson asked if he could put some clothes on first, and O'Donnell responded, "[N]ope, you're going just like this." When Gibson was cuffed, his towel dropped because he could not hold it up anymore, and he was left standing naked in front of the officers. Gibson could not recall denying whether he and Jusi had an argument, but he testified that if they asked him if there was an argument, he may have at first lied and said "No."

Gibson testified that at the time of the incident, Jusi had a "scar" on her left calf, which was from a motorcycle accident. However, he stated that he did not have any marks on him from any physical altercation, because there was none that night. He testified that he had never hit or shoved Jusi, and she had never hit or scratched him.

B. Loren Jusi

Jusi testified that Gibson did not assault her on the night in question, and that if the downstairs neighbor heard anything "physical" or "banging around" before police arrived, it must have been when she and Gibson were having sex. She stated that their sex may have been "loud" and could have been "misconstrued" by the neighbor. Jusi testified that if she was crying before the police arrived, it was because she and Gibson "were having a conversation about some pretty deep things," that she was "crying to him," and "he was consoling me." Jusi stated that the "emotional" discussion that they had was about her having worked as an exotic dancer before she met Gibson.

She admitted that at first she told the officers that there was "nothing going on" and there had been no argument. Jusi testified that she did not remember going out on her apartment balcony to make any phone call that night. She stated that if the downstairs neighbor had any audio recording of sounds from the apartment that involved "banging" or a woman's voice "crying," it would have just been from "wild sex." Jusi testified that the "emotional" discussion was not what she "would deem an argument," and she "didn't recall . . . shouting [or] screaming." Jusi stated that her ex-boyfriend had contacted her earlier, but she did not "recall . . . that it sparked anything."

Jusi did not remember if she heard the police pounding on the door when she was in the shower, but when she did hear someone knocking, she did not want to answer the door because she was not expecting anyone. Jusi confirmed that when she heard the police call for Gibson to open the door, she told him not to because she was afraid he would be arrested. Jusi believed the police were there because the downstairs neighbor had made a false complaint of domestic abuse, and she thought the police would arrest Gibson because they also had arrested him when they came to the house in 2015. She had told the police then that Gibson did not abuse her, but the police "didn't want to hear anything I had to say."

Jusi testified that she has an "abrasion" on her left calf which is permanent, and it is a mark from an old motorcycle accident. Any such mark that may be present is difficult to discern from the photograph submitted as an exhibit to the plaintiffs' motion, even though the photo itself is clear and in full color. However, Jusi testified that she told O'Donnell that "there's no way that's from Scottie because I've had it before I've been with him."

Jusi also told O'Donnell that she was never physically assaulted by Gibson, either on the night of January 15, 2016, or in November 2015, when Gibson previously was arrested for domestic

assault.  She testified that the charges from November 2015 were dismissed on the morning of trial because she did not show up for the scheduled court date.

## C. Deputy O'Donnell

O'Donnell admitted that before January 15, 2016, he did not know either of the plaintiffs and had never had any prior contact with them.  O'Donnell also confirmed that he did not know any of the details of the November 2015 domestic violence complaint that originated at what turned out to be the plaintiffs' residence.  He testified:

> Q.      [Before you arrived], had you been given any type of information about either the people at the unit or the unit itself?
> A.      I had.  I asked our dispatcher after I was dispatched to the run, that there was a report of a domestic in progress there — I asked if there was any prior contacts at the residence, at which time I was advised that we had responded there in November of 2015.  At that time, I asked what the nature of that was, and there was a domestic arrest made.  However, at that point, I did not know who was arrested, nor did I know who the complainant or victim or the suspect was.
> Q.      And prior to forcing entry into the unit on the [15th] . . . had you learned, subsequent to your initial dispatch and prior to forcing entry, who the prior participants were in the prior domestic call?
> A.      No, I did not know that.

Plfs.' Mot. for Summ. J., Ex. A, Timothy O'Donnell dep. at 8-9 (Pg ID 349-50).  O'Donnell estimated that he arrived at the plaintiffs' apartment complex less than 10 minutes after he was dispatched.

When O'Donnell arrived, he saw the plaintiffs' downstairs neighbor, Aaron Boyd, standing on the balcony outside his apartment.  O'Donnell asked Boyd if they could go inside Boyd's apartment to talk, which they did.  Boyd and his fiancé then told O'Donnell that Boyd had called the police because they had "heard . . . what sounded to be a domestic assault in progress."  Boyd stated in conclusory terms that the couple could "hear her being beaten by him," and he "used the

term 'whipping her ass.'"  Boyd stated that they "could hear what appeared to be a struggle upstairs," that "they could hear bumping noises and the sounds of an assault taking place," and they "could hear her crying for him to stop."  Boyd also identified his upstairs neighbors by name as Loren Jusi and Scottie Gibson.  Boyd's fiancé interjected that she had overhead Jusi come out onto the upstairs balcony and make a phone call, and that during the call Jusi said "He beat me up again."  Boyd's fiancé did not say when that call had occurred.

Boyd offered to play an audio recording from his cell phone, stating, "I even recorded what was going on."  Boyd told O'Donnell that he had "recorded [it] just before and during the time that he called the police to report it."  O'Donnell listened to around 10 seconds of the recording and "did hear muffled sounds of what I interpreted to be signs of a struggle based on what I was actually hearing and what Mr. Boyd [was] explaining to me that he was believing [he was] hearing  at the same time."  O'Donnell testified that he also "heard an inaudible female voice that sounded to be in distress."  O'Donnell testified that most of the recording of the female voice he heard was "inaudible," but he believed the voice had a note of distress because it was "elevated" or "excitable."  O'Donnell also conceded that the noises, so far as he could discern them from the recording, could have been caused by many things, including "playful wrestling," and that he relied on Boyd's narrative commentary interpreting the sounds, such as "This is where I'm hearing her being thrown around."

When he arrived and while he was talking to Boyd, O'Donnell had "not heard anything" himself from the plaintiffs' apartment unit.  After he talked to Boyd, O'Donnell went upstairs and "listen[ed] for a minute," and he heard "what sounded to be water running."  O'Donnell had been inside units in the complex before, and from his familiarity with the layout of the units, he assumed

that the sound was from water running through the pipes in the bathroom, which is close to the outside wall near the unit's entry door.  U.S. Border Patrol Agent Brian Peebles was on scene with O'Donnell, and Peebles also could hear water running.  O'Donnell knocked again at the door, and he then thought that he heard "footsteps" that sounded like someone walked past "right beyond the door I was standing in front of."  When he heard the footsteps, O'Donnell "immediately knocked again and announced [his] presence," but "[n]obody came to the door at that point."

O'Donnell testified that at that point, based on the statements of the downstairs neighbors, the report from Boyd's fiancé about the phone call she overheard, the recording he listened to, and the "furtive movements through the apartment where [the occupants] walked right by the door as I'm knocking," he concluded that "there was something unsafe, or not appropriate, going on inside the apartment, which led me to investigate further."  However, O'Donnell also "admit[ted] that [the occupants] didn't have the requirement at that point to open the door for the police."  O'Donnell asked Agent Peebles to stay upstairs, and he went back downstairs to speak to Boyd again.  While he was downstairs, Boyd again played audio from his phone, which O'Donnell testified he was not sure whether it was from the same audio file or not, but Boyd "said it was from the same recording that was made just minutes before my arrival." During the second playback, O'Donnell heard Boyd himself say "They're going at it again."  While he was downstairs, O'Donnell did not hear anything from the upstairs unit.  O'Donnell went back upstairs, where Agent Peebles had been waiting quietly.  Peebles told O'Donnell that he had heard a male voice inside the apartment say "Shut the fuck up," and a female voice had "responded something to the effect of 'Please stop.'"

O'Donnell testified that the Sheriff's Department has access to an on-call judge for after-hours search warrant requests.  However, O'Donnell stated that in order to get a warrant he would

have had to go back to his field office, compose an affidavit, discuss it with a prosecutor on duty, and then fax it to the on-call judge before calling him. O'Donnell estimated that process "would have been an hour or more to undertake." O'Donnell testified that his call logs indicated that his fellow Sheriff's Deputy Daniel Bueche arrived on the scene at 1:36 a.m. By that time O'Donnell "had already spoken with [his] on-duty supervisor," who had "affirmed [his] decision to make a warrantless entry based on exigent circumstances." O'Donnell returned to the upstairs unit where Agent Peebles still was waiting, but he still "heard no active, obvious signs of an assault taking place at the time." Nevertheless, within minutes after Bueche arrived, at 1:40 a.m. by O'Donnell's estimation, the officers kicked in the door to the apartment.

O'Donnell testified that his concern was that the female whose voice Peebles overheard was being held inside under duress, and that she was not free to answer the door; he wanted to ensure her safety. O'Donnell conceded that if he had "walked up and just cold knocked and heard two voices on the other side of the door" speaking as Peebles overheard, it may have indicated to him no more than that the people on the other side of the door did not want to open the door. But O'Donnell felt that the "totality of the circumstances" suggested that something more was going on in the apartment.

After O'Donnell entered the apartment, he determined that the occupants were in the bathroom and knocked on that door. A female voice responded and stated she was taking a shower and was undressed. When O'Donnell asked who was with her, Jusi responded that nobody was, but when asked if Gibson was in the bathroom with her, Jusi said yes. When Gibson and Jusi emerged from the bathroom they were wet, and the mirror in the bathroom was "heavily fogged from condensation."

O'Donnell asked Jusi if there had been a domestic assault and Jusi told him there had not. However, he "observed what appeared to be a fresh wound on her leg," and when he asked Jusi about it, she "explained to [him] a scenario that didn't make sense," which was, in O'Donnell's judgment, "her attempt to cover up what had occurred." O'Donnell stated that the "wound" appeared to be "reddish" and "pink" with "white chafing on the outer layer of skin." O'Donnell stated that Jusi told him she was on her friend's motorcycle "recently" and had "scraped her leg," but O'Donnell found that statement to be "implausible," because "in [his] mind it immediately registered that when [sic] was the last time in the last few weeks that I had seen a motorcycle driving on wintery Michigan roads." But O'Donnell did not inquire further about the injury, and he admitted he did not ask Jusi if she was somewhere other than Michigan "recently" (e.g., any place with a warmer climate) when she was riding a motorcycle. O'Donnell did not observe any other injuries on Jusi's person. O'Donnell also was suspicious because Jusi told him at first that there was no argument, but then said that they had argued about her job. O'Donnell conceded there is no crime in having a loud verbal argument. He subsequently forwarded the charge of domestic assault to the prosecutor, but no charges were filed because Jusi did not want to pursue it.

### D. Aaron Boyd

The plaintiffs' downstairs neighbor, Aaron Boyd, stated in an affidavit that he "attempted to record on a few occasions some of the sounds of the physical abuse, and provided what [he] was able to recover to Deputy O'Donnell." Boyd's declaration does not identify what he meant by "a few occasions," and he did not attest that he recorded the audio he played just before he called 911, or that he made any representation to Deputy O'Donnell about when the recording was made. Boyd also suggested in his affidavit that the phone call that his fiancé overheard occurred "at one point

during the course of [the plaintiffs'] stay" in the upstairs unit. Boyd did not attest to the date when that eavesdropping occurred, and he did not attest that the call happened just before he summoned the police on the night of January 15, 2016. As Boyd described the call:

> At one point during the course of their stay in 203A we heard Ms. Jusi step outside and make a phone call. My wife heard the call and then asked me to come outside to hear part of the conversation between Ms. Jusi and an unknown person. During the part of the call I listened to, I heard Ms. Jusi say "I don't know what I am going to do, I love him, but he hurts me a lot." My wife heard more of the conversation than I did. Days later after hearing the continued physical abuse, and Ms. Jusi crying, I called 911. When Deputy O'Donnell arrived, I provided him with this information.

Boyd aff. ¶ 10.

## E.

The plaintiffs filed their complaint on April 17, 2016, alleging via 42 U.S.C. § 1983 that defendant Deputy O'Donnell violated their rights under the Fourth Amendment by unlawfully entering their home (Count I) and arresting plaintiff Gibson without probable cause (Count II). The complaint named other defendants and raised other claims under state law, but those defendants and claims were dismissed by agreement of the parties. The parties timely filed their cross-motions for summary judgment.

## II.

The fact that the parties have filed cross motions for summary judgment does not automatically justify the conclusion that there are no facts in dispute. *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003) ("The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate."). Instead, the Court must apply the well-recognized summary judgment standards when deciding such cross motions: the Court "must evaluate each motion on its own merits and view

all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A trial is required when "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Notably, however, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson*, 477 U.S. at 251-52).

The main thrust of defendant O'Donnell's motion is that he is entitled to qualified immunity from the plaintiffs' claims. The doctrine of qualified immunity insulates state actors from liability in close-call situations. *See Saucier v. Katz*, 533 U.S. 194, 206 (2001) (explaining that the defense is intended to protect state actors who must operate along the "hazy border" that divides acceptable from unreasonable conduct). But that affirmative defense protects government actors performing discretionary functions from liability for civil damages only when their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The purpose of the defense is to strike a balance that "accommodates the tension between permitting litigants to recover damages, which is often the only realistic avenue for vindication of constitutional guarantees, and the social costs of such suits, including the expenses of litigation, the diversion of official energy from pressing

public issues, and the deterrence of able citizens from acceptance of public office." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004) (quotation marks and citation omitted).

Once the qualified immunity defense is raised, "the plaintiff must show that (1) the defendant violated a constitutional right and (2) that right was clearly established." *McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016) (citing *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013)). The plaintiff must clear both hurdles, but the Court may take up the questions in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (abrogating in part *Saucier*, 533 U.S. at 201).

The qualified immunity defense may be raised at any stage of the case. When it is raised in a motion for summary judgment, as here, courts must weave the summary judgment standard into each step of the qualified immunity analysis. *Scott*, 550 U.S. at 378. That means that the court must view the facts in the light most favorable to the plaintiff, *Saucier*, 533 U.S. at 201; "[i]n qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Scott*, 550 U.S. at 378.

A.

As noted above, the plaintiffs contend that Deputy O'Donnell violated their Fourth Amendment rights in two ways. The first is by breaking into their apartment without a warrant. The second is by arresting Scott Gibson when there was no probable cause that he committed a crime.

1.

The undisputed facts show that the defendant broke down the door of the plaintiffs' apartment, and he had no warrant at the time. According to the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." "'[A] search conducted without a warrant issued upon probable

cause is *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'"  *United States v. Doxey*, 833 F.3d 692, 703 (6th Cir. 2016) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).

It is accepted doctrine that "'[a]t the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'"  *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (quoting *Silverman v. United States,* 365 U.S. 505, 511 (1961)).  In fact, the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. U.S. Dist. Court for E. Dist. of Mich.*, 407 U.S. 297, 313 (1972).  "With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no."  *Kyllo*, 533 U.S. at 31 (citing *Illinois v. Rodriguez,* 497 U.S. 177, 181 (1990); *Payton v. New York,* 445 U.S. 573, 586 (1980).

O'Donnell acknowledges that he forced entry into the plaintiffs' apartment without a warrant, but he insists that exigent circumstances justified his actions.  And the appellate courts have held that "[p]olice may . . . enter a private home where exigent circumstances exist, i.e., where an especially serious and time-sensitive law enforcement need requires it."  *Smith v. City of Wyoming*, 821 F.3d 697, 710 (6th Cir. 2016) (citing *Payton*, 445 U.S. 573 (1980); *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294 (1967)).  "The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." *Hayden*, 387 U.S. at 298-99.

"To determine whether a law enforcement officer faced an emergency that justified acting without a warrant, [the Court must look] to the totality of circumstances."  *Missouri v. McNeely*, --- U.S. ---, 133 S. Ct. 1552, 1559 (2013).  For instance, it is well established that "[p]olice may enter

a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 398 (2006). But "[f]or exigent circumstances to excuse a warrantless search or seizure, there must be both 'compelling need for official action and no time to secure a warrant.'" *Carlson v. Fewins*, 801 F.3d 668, 674 (6th Cir. 2015) (quoting *McNeely*, 133 S. Ct. at 1559).

O'Donnell points to information provided by the plaintiffs' neighbor, along with observations that he made at the scene, that he believes would justify a reasonable officer in his position finding a basis for reasonable suspicion to investigate the neighbor's report of a domestic assault at the plaintiffs' home. He undoubtedly is correct. But he also contends that the information rose to the level of probable cause. The record does not support that argument. *First*, he cites the 911 call made by the plaintiffs' downstairs neighbor. The call in itself adds little to the analysis, however, because the defendant does not point to any information disclosed during the call that added to the report he received when O'Donnell spoke to the caller (Boyd) at the scene.

*Second*, the defendant references the audio recording played by Boyd, which he contends "corroborated" Boyd's report that he heard Gibson "shoving" Ms. Jusi, and "whipping her ass," just minutes before O'Donnell arrived. But even taking the defendant's testimony about that call at face value, the recording does not bolster the conclusion that immediate action was needed, because O'Donnell conceded that most of the "10 seconds" of the audio recording was "inaudible," that the noises he heard could have been the result of any of a variety of things (such as, by his own concession, "playful wrestling," or, as plaintiff Jusi suggested, "wild sex"). And O'Donnell testified that, due to the uncertain nature of the audio, he relied on Boyd's narrative commentary to determine the nature of the sounds recorded, such as Boyd's comment that, "This is where I'm hearing her

being thrown around."  The only thing O'Donnell testified that he concluded from the recording was that he heard a female voice that sounded "elevated" or "excitable."  The audio recording, therefore, did nothing to "corroborate" Boyd's report, beyond disclosing the sound of an indistinct female voice; O'Donnell testified that his assessment of the other sounds was not based on the recording itself, but on Boyd's narrative interpretation of it.

Moreover, O'Donnell should have realized from Boyd's own account about how the recording was made, and from the substance of Boyd's report about what he heard, that Boyd was not, and did not claim to be, a witness to any of the "shoving" or "beating" that he surmised the sounds from upstairs evidenced.  Instead, he was, at most, an "earwitness," and he never reported anything other than what he had heard, indistinctly, through the walls.  Boyd discussed what he heard through the ceiling of his apartment from the upstairs unit, but he never claimed that either he or his wife witnessed any physical assault on Jusi by Gibson.  He simply concluded that the sounds he heard must have been those of Gibson "beating" Jusi.  The nature of the sounds, or the cause of them, was not clarified by the poor-quality recording, which to O'Donnell disclosed nothing more than some sort of physical activity and an "excitable" female voice.

O'Donnell's own observations on the scene did nothing to bolster any conclusion that a violent encounter was ongoing in the plaintiffs' home when he arrived, or that there was anyone inside the home who was injured or in need of immediate aid.  O'Donnell conceded that the "footsteps" and hushed utterances that he heard suggested at most that someone was in the apartment, and that one occupant of the residence did not want the other to open the door.  Nothing that O'Donnell heard on the scene indicated that there was any imminent or ongoing physical struggle taking place in the apartment, or that anyone was hurt and needed help.

O'Donnell also asserts that the prior domestic incident in November 2015, which he discusses at length in his briefing, supplied additional cause for concern. But he admits that when he was at the scene, he did not know anything about that event, including who was involved or who was arrested. Rather, he concedes that he knew only what the police dispatcher had told him when he responded to the call, which was that there had been police contact, and a domestic violence arrest was made. That insubstantial report of an incident involving unspecified parties adds nothing that plausibly could support a conclusion that immediate forcible entry to a quiet home was warranted, two months after the fact, to halt any present risk to the safety of anyone in the home.

*Third*, O'Donnell also asserts that his on-scene investigation elevated his concern for Ms. Jusi's well-being when (1) he knocked on the door and heard footsteps near the door indicating that someone was in the apartment and was aware of his presence; (2) Agent Peebles told O'Donnell that he heard a female crying and pleading for someone to "please stop," and a male responding "shut the fuck up"; and (3) nobody answered the door or assured O'Donnell that Ms. Jusi was alright. That version does not fully align with the plaintiffs' version of the facts, however. Although Gibson and Jusi acknowledge that they might have uttered the word "stop," neither agree that Gibson told Jusi to "shut up." According to the plaintiffs, when O'Donnell returned to the apartment after his second visit to the downstairs neighbor, the plaintiffs already were in the shower.

Accepting the facts in the light most favorable to the plaintiffs, what O'Donnell actually had to go on was nothing more than Boyd's account that he heard the sounds of a loud argument and a "beating" from the plaintiffs' apartment. Taken along with the other circumstances Boyd reported and O'Donnell's observations at the scene, that report gave O'Donnell a sufficient basis for investigating further, knocking on the plaintiffs' door, and perhaps even for seeking a warrant to

enter the home to check on Ms. Jusi. But it did not supply a sufficient justification for kicking down the door of a quiet home, merely because the occupants declined to answer the door.

The facts here plainly are distinguishable from those in the cases on which the defendant relies, which involved at least some plain indication that urgent, immediate entry by police was justified. In *Brigham City, Utah v. Stuart*, for example, officers directly observed, through a window and a screen door to the home, several adults and a juvenile engaged in a vigorous brawl. *Stuart*, 547 U.S. at 400-01. Here, O'Donnell testified that he did not have any opportunity to see anything that was going on in the plaintiffs' home, due to the absence of any windows or other avenues of sight from his position outside. In *Thacker v. City of Columbus*, 328 F.3d 244 (6th Cir. 2003), a 9-1-1 caller reported a "cutting or stabbing" at the plaintiffs' home, and when officers arrived, a male "answered the door shirtless, with blood on his legs and boxer shorts," and "it was apparent that [he] was injured, as the officers could see that he was bleeding from a cut on his hand." *Thacker*, 328 F.3d at 254-55. The *Thacker* court noted that, in addition to the evident bleeding injury and other signs of an altercation that officers observed when the door was opened, there also was a concern in that case to assure the safety of the paramedics who had been summoned to the scene. No such observations or concerns are evident from the facts here.

Similarly in *Schreiber v. Moe*, 596 F.3d 323 (6th Cir. 2010), when officers arrived on scene, they "heard a male voice shouting from within the home," which corroborated an anonymous 911 caller's account that the caller had heard "screaming" and "claimed to have heard on the telephone [an] altercation as it was occurring." *Schreiber*, 596 F.3d at 330-31 (citations and footnotes omitted). In this case, O'Donnell does not point to any audible or visible indications that he or other

-18-

officers perceived when they arrived to suggest that anyone in the home was involved in an ongoing physical struggle, or that anyone inside was injured or in need of immediate aid.

In *Johnson v. City of Memphis*, 617 F.3d 864 (6th Cir. 2010), the Sixth Circuit held "that the combination of a 911 hang [up] call, an unanswered return call, and an open door with no response from within the residence [was] sufficient to satisfy the exigency requirement," and that "the police were justified in entering the home to sweep for a person in need of immediate assistance under the emergency aid exception." 617 F.3d at 869-70; *see also Sanders v. Detroit Police Dep't*, 490 F. App'x 771, 774 (6th Cir. 2012) ("The entry in this case was triggered by Tiyani's emergency phone call that Sanders had assaulted and threatened her. Such a warrantless entry may be proper if it fits into what has come to be known as the 'domestic abuse exception.'") (citing *Randolph*, 547 U.S. at 126-27; *Thacker*, 328 F.3d at 254). No similar circumstances were present here. The 9-1-1 call was not placed by Jusi or from her home, and there was no "hang up" — which reasonably could be construed by police as indicating that the caller is in distress unable to speak. The defendant asserts that the police dispatcher called a phone number from the report of the November 2015 incident, and that a male answered, stated Jusi was not present, then hung up. But that information is immaterial to the assessment of exigent circumstances in this case because O'Donnell testified that he did not know about that call, or that it had been made, when he forced entry to the home, and it therefore could not have had any bearing on his decision. Although there was "no response" from the occupants of the apartment when officers pounded on the door, there was no "open door" in this case, which might have indicated a cause for concern by officers that someone in the home recently had fled, or was in distress within.

Perhaps the facts in this case would have sufficed as probable cause for a warrant to enter the home and search for evidence of domestic violence, had the defendant sought one. But O'Donnell has not suggested information that any reasonable officer in his position would have taken as establishing an urgent imperative for him to kick down the door without delay. Under the totality of the circumstances, O'Donnell's warrantless entry into the plaintiffs' apartment violated their right under the Fourth Amendment "to be secure in their . . . houses . . . against unreasonable searches and seizures." *See Smith v. City of Wyoming*, 821 F.3d 697, 711 (6th Cir. 2016).

Was that right "clearly established" at the time? It was if "'[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). But when assessing the clarity with which the constitutional right was established at the time of the officer's conduct, courts must guard against defining the right too broadly; instead, "[t]his inquiry . . . must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. "The relevant inquiry is 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Ibid.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). "The purpose of the 'clearly established' prong, clarified by the Supreme Court's decision in *Hope v. Pelzer*, is to ensure that officials are on notice that their alleged conduct was unconstitutional." *Ibid.* (citing *Hope v. Pelzer*, 536 U.S. 730, 739, 741 (2002)).

This case presents a close call, not only for the Court, but more to the point, for the defendant police officer on the scene. Certainly, the better practice would have been to seek the authority from a magistrate to enter the apartment. And there likely would have been time to do that, because there

was a warrants magistrate on call for just that purpose, and no budding emergency had presented itself. On the other hand, "[n]o question has been raised, or reasonably could be, about the authority of the police to enter a dwelling to protect a resident from domestic violence; so long as they have good reason to believe such a threat exists, it would be silly to suggest that the police would commit a tort by entering, say, to give a complaining tenant the opportunity to collect belongings and get out safely, or to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur." *Georgia v. Randolph*, 547 U.S. 103, 118, 126 (2006)). Now there was no "complaining tenant" here, but it cannot be denied that there was a whiff of domestic violence in the air. O'Donnell plainly struggled with the decision whether to force entry into the apartment. There are no guiding cases that present a factual scenario that reasonably approximates the one O'Donnell confronted that night. And courts have been cautioned that "it is inappropriate, in the quietude of our chambers, to second-guess standard police procedure and [] on-the-scene judgment." *United States v. Foster*, 376 F.3d 577, 587 (6th Cir. 2004) (citation and quotation marks omitted).

Viewing the evidence in the light most favorable to the plaintiffs, the Fourth Amendment right O'Donnell violated by breaking down the door and entering the plaintiffs' apartment was not clearly established. Qualified immunity protects him from liability for that conduct.

2.

O'Donnell also argues that once inside the apartment, he was justified in arresting plaintiff Gibson. An arrest is a "seizure" within the meaning of the Fourth Amendment. "The Fourth Amendment guarantees the right to be free from unreasonable seizures." *Thomas v. City of Columbus, Ohio*, 854 F.3d 361, 365 (6th Cir. 2017). The Supreme Court "has stated 'the general rule that Fourth Amendment seizures are "reasonable" only if based on probable cause' to believe

that the individual has committed a crime." *Bailey v. United States*, 568 U.S. 186, ___, 133 S. Ct. 1031, 1037 (2013) (quoting *Dunaway v. New York*, 442 U.S. 200, 213 (1979)). "Probable cause is a reasonable ground for belief supported by less than *prima facie* proof but more than mere suspicion." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008).

"A police officer has probable cause for arrest if, at the time the officer makes the arrest, 'the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [plaintiff] had committed or was committing an offense.'" *Courtright v. City of Battle Creek*, 839 F.3d 513, 521 (6th Cir. 2016) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). "In other words, probable cause exists only when the police officer 'discovers reasonably reliable information that the suspect has committed a crime.'" *Ibid.* (quoting *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000)). "A probable cause determination is based on the totality of the circumstances, and must take account of both the inculpatory and exculpatory evidence then within the knowledge of the arresting officer." *Ibid.* (quotations omitted).

O'Donnell insists that probable cause existed to justify the warrantless arrest of plaintiff Gibson for domestic assault based on the facts noted above (particularly what Boyd told him) and three circumstances disclosed by his "investigation" after he entered the home. That cursory "investigation," according to Gibson, took around two minutes before the defendant handcuffed Gibson and advised him that he was "going to jail." Deputy O'Donnell's testimony gives no reason to question the assertion that the inquiry was cursory at best. O'Donnell argues that after he entered the apartment, (1) Mr. Gibson initially lied and stated there was no argument, and Ms. Jusi joined in that lie; (2) both then admitted that there was an argument; and (3) Deputy O'Donnell observed

physical signs of recent injuries on both plaintiffs. All of that does not amount to probable cause to believe a crime was committed, and the last item is not supported by the record.

For the same reasons discussed above, Boyd's verbal report establishes nothing more than "mere suspicion" that Gibson committed any crime on January 15, 2016. Boyd plainly was not an eyewitness to anything. The noises that Boyd stated that he overheard, including those disclosed in a 10-second audio recording (which O'Donnell conceded was mostly "inaudible") were, by the defendant's admission, as consistent with a "loud argument," "playful wrestling," or, as plaintiff Jusi suggests, "wild sex," as with a criminal domestic assault. Boyd stated that he "overheard" Jusi telling Gibson to "stop hitting her," but O'Donnell should have found that information questionable based on the lack of any evidence of a physical assault or altercation once he entered the apartment — which he assumed happened less than 10 minutes before he arrived on the scene. Clearly established law required O'Donnell to base his determination on "reasonably trustworthy information." *Courtright*, 839 F.3d at 521. The suspicion engendered by Boyd's surmise should have been dispelled when O'Donnell entered the apartment, found no evidence of the violent and dramatic physical struggle Boyd had described, and the supposed victim — Jusi — insisted that there was no assault. It should have been apparent then that Boyd's conclusions were not "reasonably trustworthy"; O'Donnell failed to "take account of . . . the . . . exculpatory evidence then within [his] knowledge." *Ibid.*

The defendant argues in his brief that he observed "injuries" on both plaintiffs, but that assertion is not borne out even by his own testimony. There is no record evidence presented by him that Gibson had any injury, including any "scratch" on his neck. Jusi insists that the "injury" that O'Donnell observed on her was an old mark on her leg caused by a motorcycle accident that

happened before she met Gibson.  But even accepting at face value O'Donnell's assessment that he saw "redness" and "slight chafing" on her leg, and that she gave a "questionable" account of the cause for the "abrasion" on her leg, that observation is not sufficient to elevate the totality of the facts presented to the level of probable cause to believe that a crime was committed.  O'Donnell was asked if a photograph of Ms. Jusi's leg presented at his deposition depicted the same "abrasion" that he observed on January 15, 2016, and he responded:

> It appears to be in the same location.  As I recall that night, there appeared to be more — that appears to be an old scar or wound.  It appears to be quite dull and dark. What I observed was a more reddened appearance to a wound in the same proximate area with some, what appeared to be minor skin chafing around the reddened wound site that indicated that the outermost layers of the dermal layer of the skin would have been upset, indicating a fresh wound.

O'Donnell dep. at 50-51.  The defendant also cites Gibson's deposition at pages 126-27 as evidence that he observed a "scratch" on Gibson's neck.  But in that segment of his testimony Gibson denied that he had any scratches or other marks on his person, and he stated that he did not remember O'Donnell asking about any such mark.  The defendant is obliged to accept the plaintiffs' version of the facts at this stage of the case.  *McDonald v. Flake*, 814 F.3d 804, 816 (6th Cir. 2016).  In his own testimony, O'Donnell never asserted that he observed any scratches or other marks on Gibson's person that night.

O'Donnell also insists that the plaintiffs' initial denials that an *argument* occurred supplied evidence that an *assault* actually had taken place.  But in the absence of evidence of an actual assault — from, for example, an eyewitness or a complaining victim — the inference O'Donnell claims to have drawn does not withstand examination.  As the defendant concedes, having a "loud argument" or "emotional discussion" is not a crime, and it certainly does not comprise any form of the crime

of domestic assault.  There is no reliable evidence in the record that anything more happened that night in the plaintiffs' home.

The defendant devotes considerable space in his briefing to the circumstances and details of the November 2015 police response to the plaintiffs' home and a domestic violence arrest and aborted prosecution that arose from it.  None of that information is pertinent to the probable cause analysis here, however, because the defendant admitted that he did not know any of the details of that incident, was not involved in the earlier case, and had no previous contact with the plaintiffs. "The facts and circumstances examined are confined to those 'within an officer's knowledge at the time of an arrest.'"  *Stricker v. Township of Cambridge*, 710 F.3d 350, 362 (6th Cir. 2013) (quoting *Crockett v. Cumberland College*, 316 F.3d 571, 580 (6th Cir. 2003)).

Defendant O'Donnell did not have probable cause to believe that Gibson committed a domestic assault or any other crime that night.  The arrest violated Gibson's right under the Fourth Amendment to be free from an unreasonable seizure.

That right was clearly established at the time.  The facts here parallel in significant detail those in *Courtright v. City of Battle Creek*.  There, the police received a telephone tip that a resident at a hotel "had come out of his room with a gun and threatened to shoot the dog of another resident." 839 F.3d  at 517 (quotation marks omitted).  When the police arrived at the scene, they identified plaintiff Courtright and arrested him.  *Ibid.*  Courtright sued for false arrest (among other things), and the court of appeals held that the arrest was not supported by probable cause.  *Id.* at 521.  The police officers argued that the phone call, coming from an eyewitness, was enough to establish probable cause.  The court disagreed, noting that "although there may be some instances in which a sufficiently reliable phone call to the police may provide *reasonable suspicion* for an investigatory

stop, we have not found any precedential case in which we concluded that a phone call, without any corroborating information, provided *probable cause* for arrest." *Id.* at 522. The court found that the officers' on-scene investigation did not corroborate the information in the 911 call.

The record facts in this case are only slightly more convincing than in *Courtright*, where the purported witness spoke to officers at the scene. But any added credibility lent by the identity of the caller was offset by the fact that Boyd never claimed to be an eyewitness to any part of an alleged assault, and only reported what he supposed had caused noise that he overheard — much of which, as the defendant concedes, could have been the result of any number of energetic forms of physical exertions by the plaintiffs not involving any criminally unconsented physical contact. No other reliable information corroborated Boyd's descriptions. No one witnessed an assault, and the apartment occupants denied that an assault had ever taken place. *See Atkins v. Twp. of Flint*, 94 F. App'x 342, 344-47 (6th Cir. 2004) (finding no probable cause for arrest for domestic assault where police, responding to a 911 call originating from the home, found a couple who insisted that no argument occurred, were told that the call was "just a misunderstanding," checked the wife for bruises, and refused the husband's request to leave the house, arresting him instead).

Viewing the facts in the light most favorable to the plaintiffs, O'Donnell's conduct — arresting plaintiff Gibson where there was an absence of any reliable evidence of a domestic assault — violated plaintiff Gibson's right to be free of unreasonable seizures that was clearly established at the time. Defendant O'Donnell is not entitled to summary judgment based on qualified immunity for that aspect of the plaintiffs' complaint.

B.

The plaintiffs seek partial summary judgment as to liability on their claim that Deputy O'Donnell unreasonably entered their home without a warrant, and on plaintiff Scottie Gibson's claim that Deputy O'Donnell unlawfully arrested him for domestic violence without probable cause. Because defendant O'Donnell is entitled to qualified immunity on the illegal entry claim, the plaintiffs' motion for summary judgment will be denied on that ground. O'Donnell contends that he detected evidence of physical injuries on both Jusi and Gibson after he entered the apartment. Viewing the evidence in the light most favorable to O'Donnell, if the jury accepts that Jusi had a "fresh wound" that O'Donnell observed, then it reasonably could conclude he had probable cause to arrest Gibson for domestic assault. Summary judgment for the plaintiff on the unlawful arrest claim, therefore, is precluded. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250.

III.

There is no material fact question on whether defendant Timothy O'Donnell is entitled to qualified immunity on the plaintiffs' claim for unlawful entry into their apartment in violation of the Fourth Amendment. Fact questions preclude summary judgment for the defendant on plaintiff Gibson's claim for unlawful arrest and for the plaintiffs on their all their claims.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment [dkt. #27] is **GRANTED IN PART AND DENIED IN PART**. The plaintiffs' claim for unlawful entry into their apartment in violation of the Fourth Amendment is **DISMISSED WITH PREJUDICE**. The motion is **DENIED** in all other respects.

It is further **ORDERED** that the plaintiffs' motion for partial summary judgment [dkt. #28]

is **DENIED**.


s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   May 23, 2017

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served
upon each attorney or party of record herein by electronic means or first
class U.S. mail on May 23, 2017.

s/Susan Pinkowski
SUSAN PINKOWSKI